UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | NUMBER |
| **GARY L. STEWART** | **02-12584** |
| DEBTOR | CHAPTER 7 |
| | |
| **CINDY D. STEWART** | ADV. NUMBER |
| PLAINTIFF | 02-1127 |
| V. | |
| **GARY L. STEWART** | |
| DEFENDANT | |

## MEMORANDUM OPINION

Plaintiff Cindy Stewart sued her former husband, debtor Gary Stewart, for a declaration that his obligation to her under their 2001 community property settlement is non-dischargeable under 11 U.S.C. §§523(a)(5) and (15). Mr. Stewart contends that a separate counter letter modified the terms of the settlement and effectively extinguished his obligation to the plaintiff.

At trial, counsel for the parties agreed that the plaintiff was proceeding on the theory that the obligation was non-dischargeable solely under 11 U.S.C. §523(a)(15),[1] and not under §523(a)(5) as recited in the complaint.

---

[1] Section 523(a)(15) excepts from chapter 7 discharge a debt, not in the nature of alimony, maintenance or support, "that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court . . . unless –

(A) the debtor does not have the ability to pay such debt from (footnote cont'd on p. 2)

The Court concludes that the obligation was not extinguished, and that it is not dischargeable.

## FACTS

Cindy and Gary Stewart's nine year marriage ended with a May 30, 2000 judgment of divorce. More than a year later, the couple settled matters relating to their community property and debts. Gary Stewart signed the community property settlement on October 31, 2001. Cindy Stewart signed it on November 9, 2001. The former spouses' agreement provides for several undertakings typical of community property settlements, including Gary Stewart's transfer to his former wife of his interest in the former family home at 17840 Chancellorsville Street in Baton Rouge; and his payment to her of $25,000, which was approximately one-half of the amount owed on the second mortgage at that time. In exchange, Cindy Stewart agreed to hold the debtor harmless from the first and second mortgage debt on the residence, which totaled $139,000 as of October 1, 2001.

In connection with their community property settlement agreement, the Stewarts also signed a document referred to by the parties as a "counter letter."[2] The counter letter provided that Gary Stewart's transfer of his interest in the home was contingent on Cindy

---

(footnote 1 con'td) income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor . . . or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

[2] The counter letter provided that the settlement would not be recorded until Cindy Stewart obtained approval for the refinancing of her home. Mrs. Stewart testified that recordation of the agreement - and transfer of the property into her name - was a prerequisite for the contemplated refinancing. The settlement was recorded in the office of the clerk of court for East Baton Rouge Parish on November 15, 2001. There is no evidence that the counter letter was ever recorded.

Stewart's refinancing of the mortgage debt, although it contained no deadline for the refinancing, or even for filing a refinancing application. The document also provided that Gary Stewart was to make the $25,000 payment to the second mortgage holder to reduce the second mortgage debt.

In October 2001, before signing the agreements, Cindy Stewart had contacted Janice Weems, a loan originator at Hibernia National Bank Mortgage Lending ("Hibernia"), about refinancing the mortgage debt. Mrs. Stewart paid $99 to Hibernia to begin the application process. Ms. Weems did not find any bank documents relating to the application that were dated between mid-October and November 27, 2001. This may have indicated a delay in the mortgage loan application process, which normally results from the lack of necessary documentation, according to the bank witness. In any event, Ms. Weems testified that according to the bank's files, at some point the bank notified a lawyer that there would be a closing, though it had not set a date for the closing.

## ANALYSIS

### I. Existence of the Obligation

Gary Stewart contends that time was critical in the agreements with his former wife. He maintains that he gave Mrs. Stewart the house and its contents, waived reimbursement claims, and agreed to pay many community debts for which Mrs. Stewart shared liability, solely to be relieved from paying the mortgages. He contends that he agreed to this so that he and his new wife, Dawn Domingue, could purchase a house together. It is the debtor's position that all of this hinged on Mrs. Stewart's refinancing of the home mortgage debt. Mr. Stewart argues that Cindy Stewart did not apply for the

3

refinancing quickly enough, although the agreement did not contain a deadline for refinancing, or even a date by which Ms. Stewart was to have applied for refinancing.

Louisiana Civil Code article 1773 provides that if no time is fixed for the fulfillment of a condition in an agreement, it may be fulfilled within "a reasonable time." The evidence showed that Mrs. Stewart promptly started the refinancing process with Hibernia on October 11, 2001, when she paid the bank $99 to begin the refinancing process. Cindy Stewart received a good faith estimate of closing costs for the refinancing and federal truth in lending disclosure statement on November 27, 2001.[3] She also offered into evidence a uniform residential loan application signed on December 7, 2001. The application recited that Mrs. Stewart had $52,000 available toward the refinancing, $25,000 of which she testified was to come from the debtor pursuant to their community property settlement. Her parents were to donate the remaining $27,000, and she also expected to receive assistance from her brother. This evidence supports a finding that Cindy Stewart was in the process of fulfilling her part of the bargain within a few weeks of the parties' agreement.

Cindy Stewart testified that she learned for the first time that Gary Stewart was not going to provide the $25,000 when she called to inform him that the bank had scheduled a closing date in early January 2002. The debtor claimed that he repeatedly advised Mrs. Stewart that he and his new wife needed to apply for final financing for their new house by December 1, 2001, in order to close by later that month. He testified that when he asked Mrs. Stewart about the refinancing in a telephone conversation around Thanksgiving 2001, she told him that she would not be refinancing by December

---

[3] The closing costs estimate was Defendant's Exhibit 7 and the truth in lending disclosure was Defendant's Exhibit 8.

4

1, 2001. The debtor's testimony was that, in response, he told her that the deal was off, that he would not pay the $25,000, and that the former family home would be sold and the equity divided. Mrs. Stewart stated that, in view of the debtor's professed intention not to pay the $25,000, she did not try to refinance after December 2001.

The debtor testified that Mrs. Stewart told him she would refinance once he signed the community property settlement – and that financing would be "immediate." The court does not find that testimony credible, or that version of the events probable. Ms. Weems of Hibernia testified that in the last quarter of 2001, a great deal of refinancing activity was taking place. She also stated at trial that when loan refinancing applications were at a high level as they were in late 2001, a residential refinancing could take between 45 and 60 days. Also, it is inconsistent with the debtor's continued payment of the second mortgage obligation until mid-2002.

Mr. Stewart and his divorce attorney, H. Michael Aaron, both knew that Cindy Stewart may have had difficulty refinancing the first mortgage and second mortgage debt on the home. In fact, Mrs. Stewart testified that she had to obtain money from family members to qualify to refinance the mortgage debt. The debtor therefore should not have been surprised that the refinancing process did not move as quickly as it may have moved for an applicant with more resources. The termination of the refinancing process resulted from the debtor's decision to call off their agreement, and not Mrs. Stewart's willingness – or inability – to do so.[4]

The debtor's claim that the entire community property settlement failed also is belied by his own agreement in early 2002 to pay $280 monthly on the second mortgage

---

[4] Under Louisiana Civil Code article 1772, that "a condition is regarded as fulfilled when it is not fulfilled because of the fault of another party with an interest contrary to the fulfillment."

until the end of 2002, or until he gave Mrs. Stewart the $25,000.[5] Had Mr. Stewart believed the agreement was void as the result of an unfulfilled condition, he could have refused to make the payment and raised the issue of the alleged nullity of the community property agreement in state court. He did not do so.

Finally, the debtor now contends that he did not have the $25,000 to contribute to Mrs. Stewart's refinancing, but was dependent on his new wife for the money, which she was to have obtained from the sale of her home in Miami. When Cindy Stewart allegedly refused to apply for the refinancing by December 1, 2001, the debtor said that his new wife spent the money she was to have given him for the payment to Cindy Stewart, and purchased their new home in her own name. Neither the Community Property Settlement nor the counter letter qualify Mr. Stewart's undertakings or reference the outside source of funds. He cannot now attempt to add another condition to the agreement or cite this to excuse his failure to perform his undertaking to his former wife. Louisiana Civil Code article 2046; *Gebreyesus v. F.C. Schaffer & Associates, Inc.*, 204 F.3d 639, 643 (5th Cir. 2000) (under Louisiana law, extrinsic evidence cannot be used to negate or vary the terms of an unambiguous contract).

The plaintiff was prepared to fulfill her agreement within a reasonable time, within the meaning of Louisiana Civil Code article 1773. Accordingly, the debtor's $25,000 obligation to Cindy Stewart arising from the Community Property Settlement was not extinguished or modified by the counter letter. It remains enforceable as a matter of law, subject to the Court's ruling on dischargeability.

---

[5] Although Gary Stewart denied agreeing to do so, the evidence showed that he continued to make second mortgage payments until July 2002.

6

## II. Dischargeability of the Obligation under 11 U.S.C. §523(a)(15)

Mrs. Stewart, the creditor seeking a determination of non-dischargeability, bears the initial burden of proving that section §523(a)(15) applies to the debt owed by the debtor as a result of the Community Property Settlement. *In re Gamble*, 143 F.3d 223, 226 (5th Cir. 1998). The debtor's obligation to Mrs. Stewart was undoubtedly incurred in the course of their divorce, making section 523(a)(15) applicable. Because Mrs. Stewart has carried her burden, the debtor must show that one of the two exceptions is applicable. *In re Gamble*, 143 F.3d 223, 226 (5th Cir. 1998). Accordingly, Gary Stewart must prove either that he cannot pay the debt from income or property that he does not reasonably need for his support, or that the benefit to him in having the debt discharged outweighs the detrimental consequences to Cindy Stewart.

With regard to the first exception, the Court must focus its inquiry "on whether [the debtor] could make reasonable payments on the debt from his disposable income." *Id*. Mr. Stewart testified that in the fall of 2001 he was paying Cindy Stewart a total of $2,700 each month -- $550 on the second mortgage, $1100 in child support for their child together, $550 for private school tuition and an additional $500 for a purpose the debtor did not explain. Gary Stewart lost his job January 2002 and took a position with Delta Tech Service paying $75,000 per year. In January 2002, in response to his motion in state court to reduce the child support payment, Cindy Stewart agreed to a support reduction to $400 per month. In July 2002, Gary Stewart stopped giving Mrs. Stewart the $550 to pay the second mortgage.

The debtor divorced Dawn Domingue in March 2003, and married his current spouse, Cathy, about two months later. Thus, his schedule J, which was filed in

7

September 2002,[6] at the time of trial did not accurately reflect his then current monthly expenditures.  Defendant's exhibit 13 purports to set forth the debtor's expenses, but actually reflects mainly joint monthly expenses of Mr. Stewart and his current wife.  For example, the mortgage payment, homeowner's insurance and related expenses are shown as joint obligations of the debtor and his current wife.  However, the debtor testified that Cathy Stewart purchased the home in which the couple resided at the time of trial, and is really the obligor on the mortgage debt, which she could pay without any contribution from him.  Moreover, Gary Stewart drives a company-owned vehicle, and therefore has no expense for his personal transportation.  Exhibit 13 does indicate that Mr. Stewart alone is currently paying $400 in child support, $591.50 in school tuition and $150 in "child support activities" such as glasses, health maintenance and sports.

From the Court's calculations, subtracting only one-half of the mortgage and other home-related expenses listed on exhibit 13 would leaves the debtor with more than $700 disposable income each month.  Moreover, since Mr. Stewart drives a company-owned vehicle, a *joint* fuel expense of $175 monthly is unreasonable.  Accordingly, the debtor does indeed have the ability to make reasonable payments to Cindy Stewart on the $25,000 debt.

Cindy Stewart testified that her mother is now paying the second mortgage payment.  She also stated that she is receiving $750 monthly child support from the father of her other children (not the debtor's).  She testified that she works as a secretary, but there was no evidence of her income.  Nor was there any evidence of her expenses.  The

---

[6] The debtor filed his chapter 7 petition on September 10, 2002.  The debtor's original schedules I and J, which have never been amended, reflect that he does not own a house or a vehicle.

8

only asset she testified about was a $33,000 certificate of deposit that is supposedly in her name and her mother's, but to which she allegedly does not have access.

Assessing the benefit to the debtor versus the detriment to Mrs. Stewart under the second exception to §523(a)(15) requires analyzing "the totality of the circumstances, not just a comparison of the parties' relative net worths." *Gamble*, 143 F.3d at 226. The debtor's financial situation actually appears to have improved since he filed his bankruptcy case. Although his income may not be as high as it once was, Mr. Stewart has stopped paying anything on the second mortgage for the home he shared with Mrs. Stewart and he is paying much less in child support. He does not have a home mortgage in his name and is now sharing housekeeping expenses with his current wife. His vehicle expenses are minimal.

The Court has partial evidence of Cindy Stewart's current income and almost no evidence of her expenses. However, the debtor had the burden of establishing Mrs. Stewart's financial condition in order to prove that discharging his debt to his former wife would benefit him more than it would harm her. There was evidence that Cindy Stewart was having trouble refinancing the mortgage debt and planned to rely on her family for help. The testimony was that without the refinancing of her home, Mrs. Stewart cannot pay the first and second mortgages, because her mother now must pay the second mortgage note for her. If the debtor's obligation to her to pay the $25,000 is discharged, Mrs. Stewart may not be able to remain in the home, a benefit which was clearly contemplated in their property settlement. The debtor has not proven that the benefit he would receive from having his debt to Ms. Stewart discharged outweighs the detriment to her and their child that would result.

## CONCLUSION

The Court holds that the $25,000 debt owed by the debtor to Cindy Stewart arising from the Community Property Settlement is non-dischargeable under 11 U.S.C. §523(a)(15).

Baton Rouge, Louisiana, November 18, 2003.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE